UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HOUSTON PROFESSIONAL TOWING | § | |
| ASSOCIATION, *et al*, | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | CIVIL ACTION NO. H-05-0323 |
| | § | |
| CITY OF HOUSTON TEXAS, | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER**

## I.      INTRODUCTION

Pending before this Court are the plaintiffs' motion for summary judgment, declaratory judgment, and permanent injunction (Docket No. 13) and the defendant's motion for summary judgment (Docket No. 16).  The suit revolves around the city of Houston's SAFEClear Program, a program designed to rapidly remove inoperable motor vehicles from Houston's freeways.  To facilitate prompt towing, the program divides Houston's freeways into segments, and directs the city to execute contracts with tow operators for exclusive towing rights to each segment.

The plaintiffs are Houston Professional Towing Association, Homer Salinas, Justo Salinas, and Gracie Yerena (hereinafter, collectively, "the plaintiffs").  Houston Professional Towing Association is an association whose members tow vehicles in Houston city limits, and the individual plaintiffs are engaged in the business of towing in Houston city limits.  Because the defendant, the City of Houston ("the City"), did not select the plaintiffs as one of the exclusive towing companies for the various freeway segments, the plaintiffs are generally prohibited from towing on those freeway segments.  As a result, the plaintiffs complain that parts of the program

offend Equal Protection principles under the Fourteenth Amendment to the U.S. Constitution, violate antitrust laws, and are pre-empted by federal and state law.

After considering the motions, the pleadings, and the applicable law, this Court determines that the defendant's motion should be GRANTED IN PART and DENIED IN PART and that the plaintiffs' motion for summary judgment, for declaratory judgment, and for permanent injunction should be GRANTED IN PART and DENIED IN PART.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Many cities have sought and continue to seek to regulate tow truck operators ("tow operators"), and Houston is no exception.  The City's latest effort to regulate tow operators is the SAFEClear Program ("the program"), a portion of which has been challenged by the plaintiffs.[1] The Houston City Council, who designed the program to facilitate rapid clearance of all incidents from Houston freeways, enacted it on May 26, 2004.[2]  The program operates 24 hours a day, seven days a week on all major freeways (including entrance and exit ramps but excluding frontage and service roads) within Houston city limits.  The plaintiffs brought this suit on February 1, 2005, contending among other things that the program is pre-empted by federal law. The defendant responds that it has authority to enact the ordinance under an exemption to pre-emption because it was enacted pursuant to the City's safety regulatory authority.

---

1 The SAFEClear Program encompasses City of Houston, Texas Ordinance No. 2004-497 and the towing agreements entered into pursuant to it.  The challenged portion of the program is codified in Article III, Chapter 8, Division 2, § 8-127 of the Code of Ordinances of the City of Houston.

2 The term "incidents" refers to any scenario in which a vehicle is inoperable on a freeway.  It encompasses, without limitations, accidents, stalls, spills, and flat tires.

*A.      The Ordinance*

City of Houston, Texas Ordinance No. 2004-497 ("the ordinance") modifies several sections of the Houston Code of Ordinances, but the plaintiffs challenge only § 8-127 of the modified Code of Ordinances.  Nevertheless, to facilitate analysis, the Court will give an overview of the entire ordinance.  First, the preamble declares that "the public health, safety, and welfare require prompt, safe, and efficient removal of disabled vehicles from major freeways."  The numerous unchallenged parts of the ordinance relate to various towing matters, including licensing and registration requirements for tow operators, procedures and rules for consent towing at police scenes, procedures, rules, and maximum rates for non-consent towing, among other things.

Finally, the challenged section, § 8-127, provides in pertinent parts:

(a)      On recommendation of the mayor and approval by the city council, the chief of police may execute agreements on behalf of the city . . . to provide towing or emergency road service on major freeways . . . .  Such agreements shall . . . provide, without limitation, the following:

(1)      That an operator shall have exclusive rights [to tow] from a designated segment of a major freeway on a 24-hour basis provided the operator responds to the scene within the time designated in the agreement [or unless an officer decides an emergency requires another tow operator],

(2)      That the agreements shall be entered into for a period not to exceed 5 years . . .

(4)      That no fees will be charged for the towing of a vehicle except as specifically authorized by this code or the agreement . . .

(9)      That the operator will respond to a police scene with no more towing capacity than necessary . . .

(10)      That any failure by an operator to timely respond to a call for assistance shall authorize [an officer] to direct any wrecker to remove [the traffic hazard].

> (b)     It shall be unlawful for any wrecker driver to be present or remain at, or tow any vehicle from, a major freeway [unless operating under an agreement per this section. It is an affirmative defense if the wrecker driver is acting pursuant to specific police instructions] . . .

> (c)     Notwithstanding the rates established for non-consent towing under section 8-123 of this code, the chief of police, with the approval of the mayor, may establish a fee for tows performed pursuant to agreements executed under this section . . . .

City of Houston, Texas, Code of Ordinances, Art. III, Ch. 8, Div. 2, § 8-127.  The ordinance also dictates that the exclusive towing agreements could begin as of January 1, 2005.  And, the parties agree that violation of the ordinance can result in criminal misdemeanor charges.

### B. The Agreements

Pursuant to the ordinance, in late 2004, the City divided its freeways into 29 segments and auctioned off each segment.  The winning bidder entered into an agreement with the City via the chief of police.  While the ordinance mandates some of the terms in the agreements, other terms are left to the discretion of the chief of police.  Specifically, the agreements obligate a tow operator to respond within six minutes of dispatch from the City in order to maintain the exclusive right to tow.[3]  Further, in the event that an assigned tow operator encounters an abandoned vehicle without being dispatched by the City, the agreements direct him to contact the police department prior to towing.  The agreements also describe the equipment a tow operator must carry, the annual fee that the operator or company must pay for the exclusive towing rights, the method of payments he must accept from a motorist (credit cards must be accepted), the locations to which he must tow a vehicle, and the fee he may charge a motorist.

In addition, after the City entered into the initial agreements, the Mayor of Houston proposed changes to the program, which the City Council adopted on February 2, 2005.  Pursuant to the amended agreements and §8-127(e), there are three separate towing fee levels.  First, a motorist can receive a free tow when the vehicle (with motorist present) is not in a

---

3 Again, the exclusive towing right is subject to exception when an officer finds that a public emergency requires use of another tow operator.

moving lane and has a flat tire, a mechanical failure, or an empty gas tank.  In that situation, the vehicle "shall be towed from the freeway to a safe location within one mile from the nearest exit," unless the motorist is out of gas, in which case she shall be towed to the nearest gas station.  Also, if the motorist has a flat tire and a good spare, the tow operator must tow the vehicle to a safe place and change the tire at no charge to the motorist.  The City reimburses tow operators $50.00 for every tow that is free to the motorist.

Second, in the event that a vehicle is

- stopped in a moving lane of traffic and attended by the motorist,

- stopped in a non-moving lane of traffic and towed with the agreement of the motorist beyond one mile from the nearest exit,

- abandoned and not in a moving lane of traffic, or stolen, the fee is $75.00 for the first five miles, and $1.50 for each additional mile thereafter.

Finally, § 8-123 of the code of ordinances prescribes the maximum fee for vehicles that are abandoned in a moving lane of traffic or towed at the direction of a police officer as the result of an accident or arrest of the motorist.  The fee is currently around $124.00.

## III.    CONTENTIONS OF THE PARTIES

The plaintiffs contend that the City enacted the program to regulate the towing industry's prices and practices.  They contend that the City is preempted from such regulation by 49 U.S.C. §14501, and that the City's proffered safety rationale under § 14501(c)(2)(A) is merely a pretext. Further, the plaintiff's contend that § 8-127 of the program violates the Sherman Act (15 U.S.C. §1), the Equal Protection clause of the Fourteenth Amendment, and various sections of the Texas Transportation Code.

The City responds that it enacted the program for safety reasons, thus bringing it within an exemption to the statute's preemption pursuant to 49 U.S.C. §14501(c)(2)(A).  Further, it

contends that the "state action doctrine" prevents the program from violating the Sherman Act, and that the program survives rational basis scrutiny relating to the Equal Protection clause. Finally, the City contends that the plaintiffs cannot show an irreconcilable conflict between the program and the Texas Transportation Code.

## IV.    STATEMENT OF THE LAW

### A.    Standard of Review

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to . . . judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of "informing the Court of the basis of its motion" and identifying those portions of the record "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings" and designate "specific facts" in the record "showing that there is a genuine issue for trial." *Id*. at 324. Throughout the analysis, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). An issue is "genuine" if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party. *See id*. at 247-49. A failure on the part of the nonmoving party to offer proof concerning an essential element of its case necessarily renders all other facts immaterial and mandates a finding that no genuine issue of fact exists. *See Saunders v. Michelin Tire Corp*., 942 F.2d 299, 301 (5th Cir. 1991).

B.      *Federal Pre-emption and the Safety Exemption*

Federal Law provides that, as a general rule, "a State [or] political subdivision of a State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1).  However, as a specific exemption, subsection (c)(2)(A) provides that subsection (c)(1) "shall not restrict the safety regulatory authority of a state with respect to motor vehicles." *Id*. at § 14501(c)(2)(A).  Although subsection (c)(2)(A) refers only to the safety regulatory of a "state," the exemption also applies to a political subdivision of a state. *City of Columbus v. Ours Garage & Wrecker Serv.*    , Inc., 536 U.S. 424, 428-29 (2002).

Hence, because tow trucks are "motor carriers" within the meaning of § 14501(c)(1); *see id.* at 430, any regulation related to price, route, or service of tow trucks is pre-empted by federal law unless it pertains to the political subdivision's safety regulatory authority or falls under another exemption.  Moreover, when considering an express pre-emption case, a court must examine the statute not simply on its face, but "as interpreted and applied." *See Harris Cty. Wrecker Owners v. City of Houston*   , 943 F. Supp 711, 728 (S.D. Tex. 1996).  In essence, a court must test whether the safety rationale proffered by the political subdivision rings true, keeping in mind that "local regulations not genuinely responsive to safety concerns garner no exemption from [pre-emption]." *City of Columbus* , 536 U.S. at 442.

C.      *The Sherman Act*

The Sherman Act generally prohibits monopolies. 15 U.S.C. § 1, *et seq* .  However, the state action doctrine exempts political subdivisions from antitrust scrutiny when the municipality or subdivision of the state acts pursuant to a "clearly articulated and affirmatively expressed state policy." *Town of Hallie v. City of Eau Claire*   , 471 U.S. 34, 44 (1985); *Martin v. Mem'l Hosp.* ,

86 F.3d 1391, 1397 (5th Cir. 1996).   The state policy need not explicitly authorize anticompetitive effects, but rather the anticompetitive effects must only be reasonably foreseeable in light of the policy.  *Id*. at 43.

> D.     *The Equal Protection Clause*

"The central purpose of the Equal Protection clause of the Fourteenth Amendment is the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976).  When a legislative act is facially neutral, a court will review the act under the "rational basis" test, unless a plaintiff can establish the existence of both a discriminatory impact and a discriminatory intent.  *See id*. at 239-42.   Under the rational basis test, a court presumes the challenged statute is valid and will uphold it so long as it bears a rational relation to some legitimate government end.  *Romer v. Evans*, 517 U.S. 620, 631 (1996).  On the other hand, if a plaintiff demonstrates both discriminatory impact and discriminatory intent, a court will use heightened scrutiny to determine whether the act is narrowly tailored to further a compelling government interest.  *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995).

> E.     *State Law Pre-emption*

In order for a city ordinance to be invalidated on the basis that it conflicts with provisions of the Texas Transportation Code, the party attacking the city ordinance must carry the burden to establish invalidity.  *Robinson v. City of Longview*, 936 S.W.2d 413, 416 (Tex. App. – Tyler 1996, no writ).  Moreover, because Houston is a home-rule city, it does not look to the legislature for grants of power, but only for limitations on power.  *Dallas Merchant's & Concessionaire's Ass'n v. City of Dallas*, 852 S.W.2d 489, 490-91 (Tex. 1993).  Limitations on the power of a home-rule city cannot be implied, but must be set forth with unmistakeable clarity.  *Nash v. City of Lubbock*, 888 S.W.2d 557, 561 (Tex. App.-Amarillo 1994, no writ).

Finally, courts are guided by the rule that "[a] general law and a city ordinance will not be held repugnant to each other if any other reasonable construction leaving both in effect can be reached." *City of Richardson v. Responsible Dog Owners*, 794 S.W.2d 17, 19 (Tex. 1990) (quoting *City of Beaumont v. Fall*, 291 S.W. 202, 206 (Tex. 1927)).

## V.    APPLICATION OF THE LAW

### A.    *Federal Pre-emption and the Safety Exemption*

The parties agree that tow operators are motor carriers within the meaning of 49 U.S.C. § 14501. Because the City's program regulates price, routes, and service of tow operators, it may be saved from pre-emption only if it is genuinely responsive to safety concerns. *City of Columbus*, 536 U.S. at 442. Further, if the program is genuinely responsive to safety concerns, it may still suffer pre-emption unless "the economic burdens thereby imposed are only incidental." *Ace Auto Body & Towing, Ltd. v. City of New York*, 171 F.3d 765, 777 (2d Cir. 1999) (cited with approval in *Cole v. City of Dallas*, 314 F.3d 730, 734-35 (5th Cir. 2002)).

### 1. *Whether the Ordinance is Genuinely Responsive to Safety Concerns*

First, the City urges that this Court should look no further than the text of the ordinance because "federal courts have concluded that challenged ordinances fall within Section 14501(c)(2) based solely on [the] recitation in ordinances stating that their enactment was motivated by a safety concern." This Court disagrees with that contention. The cases the City cites for its proposition demonstrate the misstatement.

For instance, the City cites *Cole v. City of Dallas*, 314 F.3d at 734-35, for the proposition that courts should look only at the text of the statute to determine whether it is genuinely responsive to safety concerns. However, the Fifth Circuit panel in *Cole* did not base its decision on a bald recitation in the ordinance. In *Cole*, the city of Dallas passed an ordinance that, among

other things, prohibited tow operators from receiving a tow permit if they had certain specified criminal convictions, documented mental illnesses, or unsafe driving records.  *Id.* at 732. Looking solely at the criminal history provision of the statute, the court held that the "concern for safety is manifest.  It is difficult to imagine a regulation with a more direct protective nexus or peripheral economic burden." *Id.* at 735.  Hence, the court in fact analyzed the mechanics and logic of the ordinance to test its safety rationale, and concluded that the analysis was elementary and obvious because the requirements were so directly related to safety that the slight economic burdens imposed were incidental.  *Id.* at 734-35 (citing as support *Ace Auto*, 171 F.3d at 769). Further,  the *Cole* court plainly acknowledged that cases involving exemptions to express preemption garner closer analysis by stating that the plaintiff in that case had "raised no argument pointing the court to some hidden pretextual economic goal behind the provision." *Id.* at 735.  A similar analysis is revealed in another case cited by the City.  *See Galactic Towing, Inc. v. City of Miami Beach*, 341 F.3d 1249, 1252-53 (11th Cir. 2003) (finding that the ordinance was "genuinely responsive" to safety concerns and was supported by unrefuted affidavits).  The City's analysis and use of *Galactic Towing*  is equally flawed.

Second, the City argues in the alternative that even if the Court looks beyond the face of the ordinance to determine the City's intent, the ordinance is genuinely responsive to safety regulatory concerns.  The stipulated record makes clear that the City investigated the safety aspects of the program.  The City intended the program primarily to reduce "secondary accidents," but also to reduce the dangers associated with "chasing" by tow truck operators and with citizens attempting to repair their vehicles on unsafe freeway shoulders.

The City's primary safety concern, secondary accidents, refers to auto *accidents* caused by the back up and congestion resulting from a primary *accident* or *incident*.[4]   Quantifying the number of secondary accidents is difficult because no standard definition of a secondary accident exists.   Most definitions involve tallying police records of accidents that occur within a given time frame and distance from a primary accident or other incident.   For instance, one definition is "any accident occurring within 15 minutes and within one mile upstream of a primary accident being reported to the police."[5]   Another method sometimes used to quantify secondary accidents is to review video of a freeway after a primary accident and to determine visually whether later accidents in a defined area resulted from the primary accident.

The City asserts that its primary rationale for enacting the ordinance can be found in the statement that "30% of all *crashes* are secondary to *incidents*." (emphasis added).   The statement comes from a presentation to the city transportation committee, but unfortunately does not cite a source for the statistic.[6]   In an effort to determine whether the City's program was genuinely responsive to safety considerations, this Court undertook a thorough review of the stipulated record and outside sources to assess the objective evidence supporting the contention that longer *incident* clearance times increase the number of secondary *accidents*.   Although the City argues that it is "beyond the province of the Court to engage in an examination of the adequacy of the evidence considered by the City," the Court must examine the adequacy of the evidence to

---

4 The terms "accident" or "crash" refers to a collision damaging at least one vehicle.  The term "incident" generally refers both to accidents and non-collision occurrences such as stalls, flat tires, etc.  Because the distinction between the terms bears significance in this analysis, they will often be italicized throughout the section.

5 Generally, accidents that occur within quick succession (a few seconds) of a collision are considered one major accident, not secondary accidents.  Measuring secondary accidents from the time the accident is reported (as opposed to when they occur) helps in this respect.

6 A thorough review of the record and outside sources reveal that the statistic is derived from a New Hampshire traffic committee report.  The report itself could not be located or reviewed.

determine the responsiveness of the ordinance to the safety rationale - especially when the plaintiff makes a colorable argument that the safety rationale is a sham.  *City of Dallas*, 314 F.3d at 734-35.

A review of the stipulated record reveals only one full academic study on secondary accidents.  A study by Karlaftis gathered data from two highways near Gary, Indiana between 1992-1995 and determined the effect of primary *crashes* on secondary *crashes.*  Notably, the study did not reach any conclusions with regard to the effects of non-collision *incidents* on secondary accidents.  The study defined secondary crashes as crashes occurring within one mile upstream and within 15 minutes after the crashes are reported out by police dispatch.  It concluded that 35% of all crashes were secondary to primary *crashes*.  Hence, the study supports the notion that longer clearance times for crashes lead to increased numbers of secondary crashes, but says nothing about the effects of non-collision incidents.

Two facets of the Karlaftis study gave this Court pause.  First, research reflects that *accidents* represent only around 10% of all *incidents*.  Thus, the extrapolation from the Karlaftis study, which supports a theory that delays in clearing accidents cause more accidents, to the quote by the City that *incidents* cause accidents is not intuitively obvious.  Second, the Karlaftis study came to another conclusion that calls into question the City's safety rationale: In focusing on crashes occurring on (or moved immediately to) a shoulder or ramp, the study indicated that crashes in those locations actually decrease the likelihood of a secondary accident.  In essence, the study supports a theory that crashes on shoulders, medians, and ramps actually make the freeways safer with respect to secondary accidents and, thus, would not support the City's towing program.

Other studies are mentioned in passing in the stipulated record, but much of the underlying data and methodologies are not available for review.  However, the results of these studies lend stronger support for the City's program than does the Karlaftis study.  For instance, the New Hampshire study referenced above found that 30% of all crashes are secondary to *incidents*.  Likewise, a Minnesota study found that 13-14% of all peak period crashes were a result of earlier *incidents*.  Research by this Court demonstrates that myriad studies support the City's theory that *incidents* cause secondary accidents.  *See* [Minnesota Dept. of Transp., FIRST Program   Evaluation,   presented   in   November   2004,*available   at* http://www.dot.state.mn.us/tmc/documents/FIRST-Program-Evaluation.pdf]   (listing   nine internet-published reports/articles and seven published studies supporting the view that *incidents* lead to secondary accidents).[7]  In the face of widespread literature and data, the Court finds that the City's general program is genuinely responsive to legitimate safety concerns.

Nevertheless, one aspect of the City's program remains pre-empted by 49 U.S.C. 14501(c) because it is not related to safety and impermissibly regulates consent tows.  The City, through its exclusive contracts with tow operators, mandates that all tows from the freeway shall be free when the vehicle (with motorist present) is not in a moving lane and has a flat tire, a mechanical failure, or an empty gas tank.  In that situation, the vehicle "shall [have the option to] be towed from the freeway to a safe location within one mile from the nearest exit," unless the motorist is out of gas, in which case she shall be towed to the nearest gas station.  However, if a vehicle in one of the above situations wishes to be towed beyond one mile (or the nearest gas station), the City sets the fee at $75.00 for the first five miles, and $1.50 for each additional mile thereafter.

---

7 Unfortunately, the Court was unable to view the underlying data and methodologies in these reports.  Of particular interest would be whether a distinction exists between incidents that occurred on freeway lanes and those that were moved quickly to the shoulder.

*See* [§ 3.01(2)(b) of the Amended and Restated Major Freeway Tow Agreement; City of Houston, Texas, Code of Ordinances, Art. III, Ch. 8, Div. 2, § 8-127(e)].

The provision allowing a driver to choose to go beyond the one-mile safety tow runs afoul of pre-emption principles because the City is regulating the rate of a consent tow that is unrelated to safety. Although the City has the authority under the safety exemption to remove vehicles from the freeway to a nearby safe place, once the vehicle is removed from the freeway and can reach a safe place, the safety rationale is exhausted. At that point, the tow becomes a consent tow and cannot be regulated. *See* 49 U.S.C. 14501(c)(2)(C) (allowing price regulations on non-consent tows only). Hence, § 3.01(2)(b) of the "Amended and Restated Major Freeway Tow Agreement" impermissibly enforces "a provision having the force and effect of law related to a price, route, or service" of a tow operator.[8]  49 U.S.C. § 14501(c)(1).

### 2. Whether the Economic Burdens Imposed on the Towing Industry are Merely Incidental to the Safety Regulation

Freeways represent 14% of total lane miles in the city of Houston, and account for 22% of the total Houston accidents. The record indicates that between 6% and 25% of total towing revenues are derived from freeway towing. Thus, up to 25% of all towing revenues in the city of Houston are directly controlled by exclusive agreements for the 29 freeway segments. Additionally, the plaintiffs' affidavits indicate that there is an unknown economic impact because the towing industry is interconnected with the storage and repair industries.

Under the test articulated by the Second Circuit and cited with approval by the Fifth Circuit, courts look at not only whether an ordinance is reasonably related to the safety goals, but also whether "the economic burdens thereby imposed are only incidental." *Ace Auto*, 171 F.3d at 777

---

8 City of Houston, Texas, Code of Ordinances, Art. III, Ch. 8, Div. 2, § 8-127(e) allows the fees to be established in the agreements and thus is also invalid to the extent that it allows regulation (unrelated to safety) of consent tow rates.

(cited with approval in *Cole*, 314 F.3d at 734-35).  In performing this analysis, a court does not simply look at the magnitude of the economic impact, but rather compares the magnitude of the impact with the specific safety problem(s) presented.

The City cites several cases for the proposition that the economic burdens are only incidental.  As an initial matter, the Court notes that several of the cases cited by the City lend little assistance to the present analysis.  For instance, as mentioned in this Court's analysis, *supra*, the *Cole* court dealt only with a narrow provision having obvious safety relevance and minimal economic burdens.  *See Cole*, 314 F.3d at 735.  Similarly, although the City cites *Galactic Towing*, neither the district court nor the Eleventh Circuit panel in that case directly discussed the economic burden imposed by the regulation.  Instead, the district court relied on a quick analogy to *Ace Auto*.  *See Galactic Towing*, 341 F.3d at 1252-53; *Galactic Towing, Inc. v. City of Miami Beach*, 274 F. Supp.2d 1315, 1320-23 (S.D. Fla. 2002).  Hence, the only two cases referenced by the City that contain a close analysis of economic burdens are *Stucky v. City of San Antonio*, 260 F.3d 424 (5th Cir. 2001) and *Ace Auto*, 171 F.3d at 777.

*Ace Auto* involved an ordinance that, among other things, divided New York City streets into zones and directed the city to rotate service for those zones among a list of qualified tow companies for each zone.[9]  171 F.3d at 769.  To qualify for a zone, the company had to meet certain licensing requirements and maintain its own storage and repair facilities.  *Id.*  The court did not take issue with the freeway segmentation or the list of qualified tow companies, but paused to review a requirement that each tow operator must maintain its own storage and repair facilities.  *Id.* at 777.  The court acknowledged that the requirement created a large barrier to

---

9 For many of the zones, the number of qualified companies per zone was not limited.  For certain zones, however, only up to three companies would be allowed per zone, and if more than three met the requirements, the three authorized companies were chosen by lottery.

market entry and created "substantial economic burdens," but allowed the regulation to stand because "preemption analysis does not insist upon a least restrictive means test." *Id*.

In the present case, there is no requirement that tow operators maintain their own storage or repair facilities.  However, unlike the New York City ordinance, here the City does not create an unlimited list of qualified towing companies and allow them equal opportunity to tow.  Instead, the City has awarded contracts to the highest bidders and virtually closed off freeway-related economic opportunities for other towing companies.  The decision to award contracts to the highest bidder was not one relating to safety, but economics.  Thus, given the large amount of revenue derived from freeway towing, awarding exclusive freeway towing rights is not an incidental economic burden on the industry.  While the Court agrees with the Second Circuit that the inquiry is not one of least restrictive means, portions of a program that impose significant economic burdens bearing little or no relation to safety should not be sustained when substantially less burdensome alternatives exist.

The Fifth Circuit's analysis in *Stucky v. City of San Antonio*  also informs this Court's decision.  The *Stucky* court analyzed a San Antonio ordinance that made it unlawful for anyone to tow on any city streets unless directed by certain public officials.  *Id*. at 427.  In effect, the City defined all tows as non-consent tows.  *Id.*  The City awarded a towing contract for all of the tows covered by the ordinance to one towing company, while allowing some participation from subcontractors.  *Id*.  The plaintiff there complained that 49 U.S.C. 14501(c) pre-empted the city ordinance, and the city responded that it was exempt from pre-emption via the proprietary and safety exemptions.  *Id*. at 432.  Although the Supreme Court overturned the *Stucky* court's

holding with respect to the safety exemption,[10] this Court draws analogy from the *Stucky* court's reasoning as it relates to the proprietary exemption.

The municipal-proprietor exemption (also known as the market-participant exemption) exempts political subdivisions from federal pre-emption when the municipality takes actions "to serve the government's own needs rather than those of a society as a whole." *Cardinal Towing & Auto Repair Inc. v. City of Bedford, Texas*, 180 F.3d 686, 697 (5th Cir. 1999). While the intricacies of the proprietary exemption need not be reviewed here, it is important to note that the exemption does not permit a political subdivision to regulate through its spending power. Against this basic legal framework, the Fifth Circuit invalidated the ordinance on the basis that the city had overreached its proprietary purpose and impermissibly restricted market competition by redefining all city tows as non-consent tows. *Id*. at 438.

The fears of the *Stucky* court have proven prophetic. In this case, the City, through assertions of safety regulatory authority, has redefined all freeway tows as non-consent tows, regardless of the ability or willingness of a driver to procure his or her own tow service. *See id.* at 446 ("[U]nder the city's argument there is no stopping point for the potential reach of the safety exemption. Pursuant to § 14501(c)(2)(A), municipalities potentially could designate all tows in the City as implicating safety concerns and thus regulate the entire towing industry under the safety exemption."). The economic effects of the redefinition of all freeway tows as non-consent tows "frustrate[s] the normal working of private decisionmaking in a market." *See id.* at 434, 436 (highlighting the distinction between "true non consent tows," in which "the owner of

---

10 *City of Columbus,* 536 U.S. at 429 (holing that 49 U.S.C. § 14501(c)(2)(A) applied to political subdivisions).

the vehicle was unwilling or unable to specify a towing company," and consent tows, where the driver can specify a towing company).[11]

While the economic concerns presented in the instant case do not precisely parallel those in *Stucky,* this Court shares the Fifth Circuit's concerns with the potentially far-reaching effects of a city's safety regulatory authority, and thus looks seriously at the economic burdens produced by the regulation.  Here, subsections (a)(1) and (b) of § 8-127 of the ordinance excludes numerous tow companies from up to 25% of towing business, and produces unexplored residual effects on the storage and repair industries.  In sum, given the economic burdens imposed by an exclusive contract system, the Court holds that the subparts of the program that unnecessarily limit participation by qualified tow operators are pre-empted by 49 U.S.C. § 14501(c).[12]  That is not to say that the City cannot regulate the number of tow operators operating on a given freeway segment at any one time.  Rather, the City may make provisions to prevent "chasing" and congestion at accident scenes.

### B.      Sherman Act

Considering the plaintiffs' claim under the Sherman Act, the Court concludes that the state action doctrine immunizes the City from any potential violations of the Sherman Act.  The state of Texas has clearly articulated and affirmatively expressed a state policy in favor of tow truck

---

11 The City cites to the district court's decision on remand as support that the safety exemption should apply.  There the district court ruled in a one-paragraph judgment that the city's safety rationale exempted the San Antonio ordinance from pre-emption. *See Stucky v. City of San Antonio*, Civ. Action  No. SA-96-CA-1285-EP (W.D. Tex. April 29, 2003).  However, the persuasiveness of that determination is limited by its lack of formal analysis.
12 The plaintiffs argue that the Texas Transportation Code, § 502.003, which relates to maximum permissible fees that a city may charge a tow operator for towing rights, pre-empts the fees paid by the tow operators to secure a freeway segment. *See* Tex. Transp. Code Ann. § 502.003(c) (1999) ("A fee or charge under Subsection (b) may not exceed two percent of the annual gross receipts from the vehicle.").  Given this Court's ruling with regard to the invalidity of the exclusive contract system, it is unnecessary to address the plaintiffs' argument on this point.

regulation, stating, "a political subdivision of [Texas] may regulate the operation of a tow truck to the extent allowed by federal law." Tex. Transp. Code Ann. §643.201(a) (Vernon Supp. 2004-2005).  Likewise, as the City points out, Federal law grants full power to states and political subdivisions to regulate tow trucks pursuant to their safety regulatory authority.  *See* 49 U.S.C. § 14501(c)(2)(A).  The state of Texas' blanket grant of authority for political subdivisions to regulate to the extent allowed by federal law encompasses foreseeable anticompetitive effects; thus, the state action doctrine applies to the extent of 49 U.S.C. § 14501(c)(2)(A).  *See Town of Hallie*, 471 U.S. at 43; *Michigan Paytel Joint Venture v. City of Detroit*, 287 F.3d 527 (6th Cir. 2002); *Indep. Taxicab Drivers' Employees v. Greater Houston Transp. Co.*, 760 F.2d 607 (5th Cir. 1985).

     C. *The Equal Protection Clause*

With regard to the plaintiffs' Equal Protection claim, the Court notes that the record is completely devoid of any evidence of discriminatory intent.  In fact, the record reflects that the City required that participating contractors "shall comply with the City's Equal Opportunity Ordinance" and "shall comply with the City's Minority and Women Business Enterprise programs."  In the absence of discriminatory intent, the Court analyzes the ordinance under the rational basis test, asking simply whether the ordinance is rationally related to some legitimate government end.  *Washington v. Davis*, 426 U.S. 239-42.  The Court has no difficulty finding that the program is rationally related to the legitimate purpose of public safety for the reasons discussed in § (V)(A)(1), *supra*.

     D. *State Law Pre-emption*

The plaintiffs next argue that § 545.305 of the Texas Transportation Code ("TTC") pre-empts the program because § 545.305 permits removal of a vehicle from a highway only if it "is

disabled so that normal operation is impossible or impractical and the owner . . . does not designate a particular towing or storage company [for removal]."  Tex. Transp. Code Ann. § 545.305(a)(7) (1999).  However, the plaintiffs' logic is flawed.  Section 545.305(a) lists several, nonexclusive examples of situations where removal of a vehicle is permissible.  Nothing in the statute restricts towing exclusively to when the conditions of § 545.305(a)(7) have been met.  Moreover, as the City points out, § 545.305(a)(9) permits removal if, in the opinion of a peace officer, the vehicle represents a public hazard.  *Id*. at § 545.305(a)(9).

Second, the plaintiffs argue that TTC, § 683.002, which permits the removal of a vehicle that has been left unattended on the right-of-way for more than forty-eight hours, prohibits moving vehicles sooner than the forty-eight hour time period.  *See* Tex. Transp. Code Ann. § 683.002(a)(5), (7) (1999).  The plaintiffs' logic is again flawed.  The statute does not *grant* a vehicle owner the right to leave his vehicle unattended on a right-of-way for forty-eight hours.  Rather, the statute *restricts* the right of a vehicle owner to leave a vehicle on the right-of-way.  Nothing in the statute prohibits removal within the discretion of the government authority.

Third, the plaintiffs cite to TTC, § 643.206, which provides that a "towing company that makes a non-consent tow shall tow the vehicle to a vehicle storage facility that is operated by a person who holds a license to operate the facility under Chapter 2303, Occupations Code." Tex. Transp. Code Ann. § 643.206(a) (Vernon Supp. 2004-2005).  The plaintiffs argue that because the program permits removal of a vehicle to a "safe zone" at the owner's direction, the tow becomes a consent tow that is pre-empted by 49 U.S.C. § 14501(c).  As the City demonstrates, because 49 U.S.C. § 14501(c)(2)(A) does not distinguish between consent and non-consent tows, the plaintiffs' argument is  "simply a repackaging of Plaintiffs' pre-emption argument."  Hence, § 643.206 does not present an irreconcilable conflict with the program.

## VI.    CONCLUSION

For the reasons stated, the Court finds the plaintiffs' motion for summary judgment, request for declaratory judgment, and application for permanent injunction should be and is GRANTED IN PART and DENIED IN PART.  The Court finds that the Defendant's motion for summary judgment should be and is GRANTED IN PART and DENIED IN PART.

The Court rules that the portion of the ordinance that permits § 3.01(2)(b) of the Amended and Restated Major Freeway Tow Agreement[13] is invalid insomuch as the ordinance regulates consent towing rates.  The City is ENJOINED from enforcing this subpart of the ordinance as it is pre-empted by federal law.

Likewise, the City is ENJOINED from enforcing those subparts of the ordinance that excludes qualified tow operators from towing on major freeways.  *See* City of Houston, Code of Ordinances, Art. III, Ch. 8, Div. 2, § 8-127(a)(1), (b). Those subparts are also pre-empted.  The exclusive contract system is too economically burdensome on the industry.  The remaining parts of the ordinance are exempt from pre-emption under the safety exemption and are otherwise valid.

It is so ORDERED.

SIGNED and ENTERED this 31st day of August, 2005.

Kenneth M. Hoyt
United States District Judge

---

13 *See* City of Houston, Code of Ordinances, Art. III, Ch. 8, Div. 2, § 8-127(e).